**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CR353 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| GARY R. BENEDICT, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Gary R. Benedict (Benedict) (Filing No. 16).  Benedict is charged in the Indictment with the knowing possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) together with a forfeiture allegation.  **See** Filing No. 1. Benedict seeks to suppress all evidence obtained as a result of a traffic stop by the Nebraska State Patrol (NSP) on Interstate 80 in Lincoln County, Nebraska, on April 3, 2010.

An evidentiary hearing was held on Benedict's motion on January 6, 2011. Benedict was present for the hearing along with his counsel, Assistant Federal Public Defender Karen M. Shanahan.  The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda.  During the hearing, the court heard the testimony of NSP Lieutenant Mark P. Stokey (Lieutenant Stokey), NSP Trooper Ryan Hayes (Trooper Hayes), and the defendant Benedict.  The court received into evidence a DVD of the traffic stop (Exhibit 1). The court also received into evidence, under seal, Exhibits A-D, Benedict's pro se motions. A transcript (TR.) of the hearing was prepared and filed on January 12, 2011 (Filing No. 30).

**FINDINGS OF FACT**

Trooper Hayes was on patrol in uniform and in a marked NSP patrol car on Interstate 80 in Lincoln County, Nebraska, on April 3, 2010 (TR. 58-59).  Trooper Hayes' patrol car was equipped with Stalker radar equipment, which Trooper Hayes calibrated at the start and finish of his shift on April 3, 2010 (TR. 59-62).  Around 2:30 p.m. on April 3, 2010, Trooper Hayes was traveling westbound near the 169 milepost when he observed an eastbound dark colored Cadillac, which appeared to be traveling in excess of eighty

miles per hour, exceeding the posted seventy-five mile per hour speed limit (TR. 64-65). Trooper Hayes activated his rear radar antenna, which produced a reading of eighty-one miles per hour (TR. 65). Trooper Hayes decided to take enforcement action, turned into the median, and then pursued the Cadillac (TR. 65). Trooper Hayes activated his forward facing in-car camera (TR. 65; Exhibit 1). Using his overhead emergency lights, Trooper Hayes caught up to the Cadillac and the Cadillac pulled over to the side of the Interstate without incident at milepost 173 (TR. 67). As he stopped the Cadillac, Trooper Hayes ran the license plates and determined the Cadillac was registered to a Gary Benedict from Nevada City, California (Exhibit 1).

Trooper Hayes approached the passenger side of the Cadillac and observed a male driver (Benedict) and a female front seat passenger, Kelly Robyn (Robyn) (TR. 67; Exhibit 1). Trooper Hayes asked Benedict for a driver's license and other documents and informed him that he would be getting a warning ticket for speeding (TR. 67; Exhibit 1). Trooper Hayes then directed Benedict to have a seat in the patrol car (TR. 67; Exhibit 1). Trooper Hayes asked Benedict about his itinerary and about his passenger (TR. 68). Benedict said his passenger was his newlywed wife but he couldn't remember her last name (TR. 68). Benedict said they were on their way to Niagara Falls and they were going to stop and see a friend in New York and family in Michigan (TR. 68). Benedict said he was an excavator in California (TR. 69). Benedict said his wife had no relatives out East and she and her relatives were from California (TR. 69). Benedict said they were going to be away for six to eight weeks (TR. 69).

Trooper Hayes testified Benedict was very uncomfortable and nervous in the patrol car and testified that while most persons he stops are initially uncomfortable and nervous while in the patrol car, that unease dissipates, which did not happen with Benedict (TR. 71). Trooper Hayes described Benedict as constantly rubbing his legs, fidgeting with his hands, and appeared to have a rapid heartbeat as exhibited by his neck and heavy breathing (TR. 71-72). Using his laptop computer in the patrol car, Trooper Hayes printed out a warning ticket for Benedict and gave the ticket and driver's license to Benedict (TR. 74-75).

Trooper Hayes, as part of his routine in traffic stops, checks the VIN on the vehicle with the VIN indicated on the registration provided by the driver (TR. 75). Trooper Hayes

took the registration to the front of the Cadillac and checked the VIN on the dash and the inside door pillar (TR. 75). While checking the VIN Trooper Hayes spoke with the front seat passenger (Robyn) (TR. 75). Trooper Hayes asked Robyn about her relationship with Benedict, their employment, and travel plans (TR. 76). Robyn said they were traveling to Michigan to visit her brother and said there were no other travel plans (TR. 76). Robyn said Benedict had no family where they were headed (TR. 77). Robyn said she and Benedict were recently married although they had been together for five years (TR. 77). Robyn said she was from Louisiana (Exhibit 1). Trooper Hayes found the VIN to match the registration and gave the registration to Robyn (TR. 77).

 Trooper Hayes returned to the passenger side of the patrol car, had Benedict step out of the patrol car, advised Benedict the registration was given to Robyn, and asked if Benedict had any questions (TR. 78). Benedict had no questions and Trooper Hayes told Benedict he was free to leave and wished him a good trip (TR. 78). As Benedict began walking back to the Cadillac, Trooper Hayes asked Benedict if Trooper Hayes could ask him some more questions (TR. 80). Trooper Hayes recalls Benedict turning around and coming back to Trooper Hayes (TR. 80-81). Trooper Hayes then engaged Benedict in conversation about the discrepancies between Benedict and Robyn's information with regard to the travel itinerary and Benedict's nervousness (TR. 81-82; Exhibit 1).

 Trooper Hayes asked Benedict whether he could search the Cadillac and Benedict wavered in his response (TR. 83). Trooper Hayes filled out a permission to search form and had Benedict read it aloud (TR. 83-84; Exhibit 1). After reading the form, Benedict said he would let Trooper Hayes look in the trunk but not search everything (TR. 84). After further discussion, Benedict told Trooper Hayes he would not give Trooper Hayes permission to search the Cadillac (TR. 84; Exhibit 1).

 At approximately 2:54 p.m., Trooper Hayes told Benedict the Cadillac was being detained for a canine sniff, but Benedict and Robyn were free to go without the Cadillac (TR. 84-85; Exhibit 1). Trooper Hayes called his dispatch, requested a canine unit come to his location, and learned Lieutenant Stokey was on his way and would arrive in approximately thirty minutes (TR. 86). Trooper Hayes went back to the Cadillac and told Robyn that Benedict had refused permission to search the Cadillac, a canine unit was on its way to the scene, and she had to get out and stand away from the Cadillac (TR. 86).

As Benedict and Robyn were standing in the ditch alongside the Interstate, Trooper Hayes told them they were free to go (TR. 87). Benedict said he wanted to wait for the canine to arrive (TR. 87). Robyn stated she had to go to the bathroom and Trooper Hayes told her to wait for a Trooper to arrive to drive her to a facility as it was illegal to be walking along the Interstate (TR. 88).

Lieutenant Stokey arrived on the scene with his canine, Max, approximately seventeen minutes after he received the call for assistance (TR. 20). Lieutenant Stokey received the request from dispatch while he was at home and, after getting dressed, he drove the nine to ten miles to the scene with Max (TR. 19). Max is a Malenois/German Shepherd cross breed from Holland and has been with Lieutenant Stokey since 2001 (TR. 12). Max is a dual purpose (narcotics and search) dog and is a passive indicator (TR. 12). Lieutenant Stokey described the training for he and Max and both have been certified annually as a drug detection team since 2001 under state and international certification standards (TR. 12-17). Upon arrival at the scene, Lieutenant Stokey parked his vehicle behind Trooper Hayes' patrol car and observed Trooper Hayes talking with Benedict and Robyn in the roadside ditch (TR. 21). After receiving a briefing from Trooper Hayes and inquiring as to the contents of the Cadillac, Lieutenant Stokey deployed Max on a leash around the Cadillac (TR. 23). After walking Max around the Cadillac, Max alerted to the rear driver's side wheel well twice and an open window and began to sit as part of his indication (TR. 26-27). Lieutenant Stokey pulled Max out of the indication stanch and returned him to Lieutenant Stokey's patrol car due to the amount of traffic and because no other officer was present to assist (TR. 27). Lieutenant Stokey advised Trooper Hayes, who was with Benedict and Robyn in the roadside ditch, of the indication (TR. 30).

Trooper Hayes informed Benedict and Robyn that the officers now had probable cause to search the vehicle (TR. 30, 90). Benedict told Trooper Hayes that Benedict had a small amount of marijuana in the trunk of the Cadillac (TR. 90). Trooper Hayes berated Benedict for not owning up to the marijuana as it would have saved a lot of time at the scene (TR. 90). Trooper Hayes detained Benedict and Robyn by placing Benedict in the rear passenger seat, after searching him, and by placing Robyn in the front passenger seat of his patrol car (TR. 91).

In searching the Cadillac's trunk, Trooper Hayes found a glass jar with rolling papers and a small amount of marijuana (TR. 93). Trooper Hayes came across a green bag, then his attention was diverted to the patrol car by Robyn who again stated she has to go to the bathroom (TR. 93). Another Trooper was called to take Robyn to North Platte to use a bathroom facility (TR. 96). Trooper Hayes returned to search the green bag and found numerous packages of marijuana (TR. 94). Trooper Hayes returned to the patrol vehicle and placed Benedict and Robyn in handcuffs (TR. 94). Trooper Hayes solicited cooperation from Benedict and Robyn but did not *Mirandize* them (TR. 96).

Trooper Connelly arrived to transport Robyn back to the North Platte NSP office so she can use the bathroom (TR. 96). Trooper Hayes called for a tow truck to tow the Cadillac to the North Platte NSP office (TR. 97). While waiting for the tow truck, Trooper Hayes read Benedict *Miranda* rights from a card (TR. 98). Benedict stated he understood his rights and told Trooper Hayes he had 21 pounds of marijuana, which he was bringing to Michigan from California (TR. 98-100). Benedict was transported to the North Platte NSP office where Robyn was already located (TR. 102). The Cadillac was towed to the North Platte NSP office. Trooper Connelly watched Benedict and Robyn while Trooper Hayes and Lieutenant Stokey completed a search of the Cadillac (TR. 102). Several other bags containing packages of marijuana were found in the trunk (TR. 102). A duffle bag with $5700.00 in U.S. currency was found in the back seat area of the Cadillac (TR. 103). A discretionary canine sniff of the currency was conducted (TR. 31-32, 105). Trooper Hayes then told Benedict the money would be seized and Benedict was taken to the county jail (TR. 105-106).

Benedict testified that at the time of the traffic stop he had various medical conditions (TR. 141). Benedict stated he was suffering from chronic obstructive pulmonary disease (COPD) and asthma for which Benedict was taking heavy doses of Prednisone and using an inhaler (TR. 141-142). Benedict testified he also had a bacterial infection of his hands, caused by contaminated diesel fuel, which resulted in a constant itching of his hands (TR. 143). Benedict also stated he takes medication for an acid reflux condition (TR. 144). Benedict testified he had cramping problems as a results of his various maladies which cause a jitteriness or shaking of his legs (TR. 145).

## LEGAL ANALYSIS

### A. Traffic Stop

In this case, Trooper Hayes clocked Benedict's Cadillac to be exceeding the posted speed limit by using the patrol car's radar equipment. A law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (**citing** *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Even if Trooper Hayes had an ulterior motive to stop the Cadillac, an officer's subjective motivations do not affect the reasonableness of a traffic stop based on the violation of the traffic laws. *Long*, 532 F.3d at 795; *United States v. Chatman*, 119 F.3d 1335, 1340 (8th Cir. 1997) ("[T]he stop is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot.") (internal quotation omitted). There was no constitutional infirmity in the traffic stop.

### B. Detention

Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle. *United States v. $404,905.00*, 182 F.3d 643, 647 (8th Cir. 1999); *United States v. Allegree,* 175 F.3d 648, 650 (8th Cir. 1999). "If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting** *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made by the police officer regarding illegal drug use, and divergent information from the passengers. *$404,905.00*, 182 F.3d at 647; *Allegree,* 175 F.3d at 650-51.

In any event, the scope and length of any investigation must be reasonable. *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). "The investigative

methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Ward*, 484 F.3d 1059, 1062 (8th Cir. 2007) (**quoting** *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) (en banc)).

A "reasonable suspicion" must be more than an inchoate "hunch," nonetheless, the Fourth Amendment only requires law enforcement to articulate some minimal, objective justification for an investigatory stop. *Sokolow*, 490 U.S. at 7. In determining whether Trooper Hayes had reasonable suspicion, the court must consider the totality of the circumstances in light of Trooper Hayes' experience. **See** *Fuse*, 391 F.3d at 929. "Although each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, 'a combination of factors may warrant further investigation when viewed together.'" *Id.* (**quoting** *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002)). The court gives law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). This is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (**quoting** *United States v. Caves*, 890 F.2d 87, 93 (8th Cir. 1989)).

An unusual nervousness on the part of Benedict, a failure of memory as to his wife's name, the divergence of travel plans expressed by Benedict and Robyn, and the divergence of family history expressed by Benedict and Robyn, all contributed to Trooper Hayes' suspicion of criminal activity. The court finds such suspicions to be reasonable as would justify a further detention. At first, Benedict's detention was voluntary as Benedict agreed to talk with Trooper Hayes about contraband matters. While initially indicating he might permit a search, Benedict was clear when asked to sign a consent to search that he did not consent to the Cadillac being searched. When Benedict refused consent to search, Trooper Hayes detained Benedict and the Cadillac for a canine sniff. It is clear that Benedict and Robyn were both detained on the side of the Interstate along with the Cadillac. It would be absurd to say that Benedict and Robyn were "free to go" when there was no practical way to leave the scene of the stop.

"A short detention for a dog sniff after the completion of a traffic stop does not violate the Fourth Amendment." *Linkous*, 285 F.3d at 721. However, "[t]he officer cannot continue to detain a motorist after the initial stop is completed, unless the officer has 'a reasonably articulable suspicion for believing' criminal activity is afoot." *Fuse*, 391 F.3d at 927-28. The court has found Trooper Hayes had a reasonable articulable suspicion of criminal activity.

### C. Dog Sniff

The canine sniff of the vehicle did not constitute a "search" within the meaning of the Fourth Amendment. "A dog sniff is not a search within the meaning of the Fourth Amendment, and thus requires no probable cause to be performed." *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005) (**citing** *Illinois v. Caballes*, 543 U.S. 405 (2005)). This is because "a canine sniff of the exterior of personal property in a public location 'is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.'" *$404,905.00*, 182 F.3d at 647 (**quoting** *United States v. Place*, 462 U.S. 696, 707 (1983) (luggage at an airport)). Furthermore, the principle also applies to a canine sniff of the exterior of a vehicle because "[t]he exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" *Id.* (**quoting** *New York v. Class*, 475 U.S. 106, 114 (1986)). A police service canine's alert to the odor of drugs in a vehicle provides probable cause that drugs are present. *Place*, 462 U.S. at 706; *Sanchez*, 417 F.3d at 976. After probable cause is established, a car may be searched without a warrant under the automobile exception to the warrant requirement. *Chambers v. Maroney*, 399 U.S. 42, 52 (1969); *Sanchez*, 417 F.3d at 976.

Lieutenant Stokey's canine's alert to the Cadillac provided probable cause to search the Cadillac without a warrant. Once the contraband was found, Trooper Hayes and Lieutenant Stokey had probable cause to arrest Benedict and Robyn.

### D.  Statements

Once Trooper Hayes found the contraband, he placed Benedict under arrest by placing him in handcuffs. Trooper Hayes asked Benedict various questions before he

8

advised Benedict of his *Miranda* rights.  After a time, Trooper Hayes did advise Benedict of *Miranda* rights at the roadside while Benedict was seated in the patrol car.  The court finds that any statements made during the interim should be suppressed.

The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936).  The court must look to the totality of circumstances in determining whether or not the statements were voluntary.  *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).  In this case, Benedict was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  There is no evidence Benedict did not understand the advice of rights.  The court finds any statements Benedict made after he was advised of his *Miranda* rights were voluntarily made and should be admissible against him at trial.

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Gary R. Benedict's motion to suppress (Filing No. 16) be granted as to statements made between the time Benedict was placed in handcuffs and advised of the *Miranda* rights, and otherwise denied.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation.  Failure to timely object may constitute a waiver of any such objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 18th day of February, 2011.

                                                        BY THE COURT:
                                                         s/ Thomas D. Thalken
                                                        United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.